Gerald Wayne PHELPS,
Petitioner-Appellee,

v.

Jack R. DUCKWORTH, Warden, Indiana
State Prison, and Linley E. Pearson,
Attorney General of Indiana, Respondents-Appellants.

No. 84–1052.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 14, 1984.
Decided Feb. 27, 1985.
Rehearing and Rehearing En Banc
Granted May 20, 1985.*

* Opinion and judgment vacated.

David L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for respondents-appellants.

John D. Clouse, Evansville, Ind., for petitioner-appellee.

Before CUMMINGS and CUDAHY, Circuit Judges, and GORDON, Senior District Judge.*

MYRON L. GORDON, Senior District Judge.

The petitioner, Gerald Wayne Phelps, was convicted of kidnapping and rape in October 1974 for which he received concurrent sentences of life imprisonment and two to twenty-one years. The conviction was affirmed by the Indiana Supreme Court. *Phelps v. State*, 266 Ind. 66, 360 N.E.2d 191, *cert. denied*, 434 U.S. 844, 98 S.Ct. 146, 54 L.Ed.2d 110 (1977).

In 1978, Mr. Phelps filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Indiana. The petitioner alleged that his convictions should be vacated because of four instances of misconduct by the prosecutor during the course of the trial. On December 14, 1983, the district court granted the petition for a writ of habeas corpus. 582 F.Supp.

---

* The Honorable Myron L. Gordon, District Judge for the United States District Court for the Eastern District of Wisconsin, is sitting by designation.

401. We affirm the judgment of the district court.

## BACKGROUND

Theresa Clem, the prosecuting witness, was working as a dancer at the Copy Bar in Evansville, Indiana, on the night of March 27, 1984. Gerald Phelps was a patron in the bar that evening. Shortly before midnight, Mrs. Clem spoke with Mr. Phelps for a few minutes in the bar. Mrs. Clem testified that this was the first time she had met the petitioner. After leaving Mr. Phelps, Mrs. Clem changed into her street clothes and left the bar.

At trial sharply conflicting evidence was presented as to what happened after Mrs. Clem left the bar that evening. Mrs. Clem testified that from the bar she started off on foot toward the home of her babysitter to pick up her child. As she was walking, Mr. Phelps pulled alongside her in his car and stopped to offer her a ride, which she accepted. Rather than taking her to the babysitter's home, however, she testified that he forced her to commit fellatio and raped her in the back seat of his car. Mrs. Clem claimed that she struggled with him but that he overpowered her. When Mr. Phelps started driving again, according to her testimony, she escaped from the car while it was travelling 35 to 40 miles per hour by jumping out and running to the nearest house. Mrs. Clem telephoned the police from this house, and officers were dispatched to both the house and the Copy Bar. The police subsequently accompanied Mrs. Clem to the bar where she identified Mr. Phelps as her assailant, and he was placed under arrest.

Mr. Phelps told a dramatically different story at the trial. He testified that he had met Mrs. Clem for the first time while at the Copy Bar approximately three weeks prior to March 27, 1984. Mr. Phelps claimed that he had engaged in consensual sexual relations with Mrs. Clem on three occasions before March 27. The petitioner acknowledged having sexual intercourse with Mrs. Clem on the night in question but claimed that it was with her consent and not by force.

According to Mr. Phelps, he and Mrs. Clem had sexual relations in the back seat of his borrowed car in the parking lot behind the Copy Bar. While this was happening, he stated that another car pulled up to Mr. Phelps' car, and an unidentified man opened the door of the Phelps car and told the petitioner that he was a "dead mother fucker." R. 254. Mr. Phelps claimed that the man then jerked Mrs. Clem out of the car and that she fell on her knees and shoulder and started screaming and crying. According to Mr. Phelps, the man then ordered Mrs. Clem into the other car. At this point, Mr. Phelps hurriedly got out of his car and ran in the back door of the bar.

## DOYLE MISCONDUCT

Upon being placed under arrest, Mr. Phelps was "read ... his rights" by the arresting officer. R. 188, 326. Mr. Phelps, following his arrest, told the police he "didn't do it" and asked for protective custody. R. 277. The petitioner also testified that he asked to take a polygraph test, a claim contested by the police.

The deputy prosecutor attempted to impeach Mr. Phelps' exculpatory testimony on cross-examination. After reviewing the petitioner's version of the events, the prosecutor, over the objection of defense counsel, questioned Mr. Phelps about his failure to tell his exculpatory story to the police following his arrest:

Q. Well, then, am I to assume, Mr. Phelps, that that is all you said to the police?

A. Other than, you know, just normal conversation.

Q. But nothing about the crime?

A. No sir. We talked about a wreck that I had, and that's about it.

Q. Well, do you think it might have been in your best interests to have told the police and the Prosecutor's Office this story you're telling this jury?

MR. BUNNER: [Defense Counsel] I object—.

BY THE COURT: The objection is sustained. He has no obligation to tell the prosecutor anything.

Defense counsel then moved for a mistrial based on conduct by the prosecutor. Thereupon the following colloquy took place:

BY THE COURT: He had no obligation to say anything. Read the last two or three questions.

COURT REPORTER: "Well, then, am I to assume, Mr. Phelps, that that is all you said to the police?" "Other than, you know, just normal conversation." "But nothing about the crime?" "No sir. We talked about a wreck that I had, and that's about it." "Well, do you think it might have been in your best interests to have told the police and the Prosecutor's Office this story you're telling this jury?" Then Mr. Bunner objected.

BY THE COURT: The objection to that question is sustained, and the motion to withdraw the submission is overruled.

R. 280–82

The district court, relying principally on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), held that the prosecutor's attempt to impeach Mr. Phelps' trial testimony constituted a deprivation of due process. The state on appeal contends that *Doyle* is inapplicable to this case and that, even if applicable, the misconduct was harmless error. Although Mr. Phelps alleged three additional instances of prosecutorial misconduct in his habeas corpus petition, this appeal turns on the first instance of alleged misconduct.

The issue in *Doyle, supra,* 426 U.S. at 611, 96 S.Ct. at 2241, was "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." (footnote omitted). In *Doyle,* the two petitioners told an exculpatory story at their trial that they had not previously divulged to the police or to the

prosecutor. Following their arrest and the reading of their *Miranda* warnings, one petitioner declined to make any statement. The other petitioner, in response to initial questioning by the police, asked: "What's this all about?" or words to that effect. *Doyle, supra,* 426 U.S. 615 n. 5, 96 S.Ct. at 2243 n. 5. After being informed of the reason for his arrest, he stated: "you got to be crazy;" or "I don't know what you are talking about." *Id.* at 623 n. 4, 96 S.Ct. at 2247 n. 4 (Stevens, J., dissenting). On cross-examination, the prosecutor attempted to impeach the petitioners' credibility by questioning them about their failure to state their alibi to the police at the time of their arrest. The Court held that impeachment of a defendant by his post-arrest silence after he has received *Miranda* warnings violates the due process clause of the fourteenth amendment.

In reaching its holding, the Court stated: "Silence in the wake of these [*Miranda*] warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested ... Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."

*Id.* at 617–18, 96 S.Ct. at 2244–45.

A. *Miranda* Warnings

The state first contends that *Doyle* is not applicable to this case because the record does not demonstrate that Mr. Phelps was given the warnings prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), following his arrest. In *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court held that there is no *Doyle* violation when a defendant is cross-examined about

his post-arrest silence where no *Miranda* warnings had been given following the arrest.

At trial, the arresting officer testified that he "read [Mr. Phelps] his rights" following the arrest. R. 188, 326. The state argues that this testimony does not conclusively show that the petitioner was read his *Miranda* warnings as opposed to some other warnings. The state does not speculate as to what other rights Mr. Phelps reasonably might have been read immediately following his arrest.

▓▓▓ The district court found that the record revealed that Mr. Phelps was read his *Miranda* warnings following arrest. We will not set aside a district court's factual finding unless it is clearly erroneous. *United States ex rel. Hudson v. Brierton*, 699 F.2d 917, 925 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 114, 78 L.Ed.2d 115 (1983). In reviewing the lower court finding, we may infer reasonable conclusions drawn from the record as a whole. *Hudson v. Rushen*, 686 F.2d 826, 831 (9th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983).

▓▓▓ We fully agree with the district court that Mr. Phelps was given his *Miranda* warnings by the arresting officer. To hold otherwise, in light of the arresting officer's own testimony, would contradict reason and common sense. The present case is plainly distinguishable from *Fletcher, supra*, 455 U.S. at 605, 102 S.Ct. at 1311, where there was no evidence in the record that the defendant had been read his rights, *Miranda* or otherwise. There is nothing in the present record which suggests that the rights read to Mr. Phelps by the arresting officer were not *Miranda* rights. The district court's conclusion that the petitioner was read his *Miranda* warnings is reasonable and certainly not clearly erroneous.

### B.  Post-Arrest Silence

The state next contends that Mr. Phelps is not protected by *Doyle* because he was not wholly silent following his arrest. The state, however, fails to recognize that Mr. Phelps was cross-examined not about the inconsistency between his trial testimony and his post-arrest statements, but about his post-arrest silence with respect to the exculpatory story he told at trial.

The state bases its argument in large part on *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). In *Charles*, the defendant charged with murder, made a detailed post-arrest statement concerning the location from which he had stolen the victim's car. At trial, the defendant testified that he had stolen the car from a different location. The prosecutor asked the defendant on cross-examination why he had not previously disclosed the version of events to which he testified at trial and suggested that the trial version was a recent fabrication. *Id.* at 405–06, 100 S.Ct. at 2180–81.

The Court in *Charles* held that *Doyle* did not bar the prosecutor's cross-examination because "[t]he questions were not designed to draw meaning from silence [as in *Doyle* ], but to elicit an explanation for a prior inconsistent statement." *Id.* at 409, 100 S.Ct. at 2182. The Court reasoned that the omission of facts from the post-arrest version that were included in the trial version was not silence within the ambit of *Doyle*. *Id. Charles* was distinguished from *Doyle* on the basis that neither defendant in *Doyle* made any post-arrest statement contradicting his later trial testimony. *Id.* at 407 n. 2, 100 S.Ct. at 2182 n. 2.

In contrast to *Charles*, Mr. Phelps' post-arrest statement he "didn't do it" and his request for protective custody and a polygraph test were not inconsistent with his exculpatory trial testimony. Far from making a detailed post-arrest statement as in *Charles*, Mr. Phelps made the barest of statements to police.

The circuit court cases cited by the State are similarly distinguishable from the present case. *See United States v. Crowder*, 719 F.2d 166 (6th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) (No *Doyle* violation

where prosecutor brought to jury's attention fact that defendant continued to stick to detailed exculpatory story he had given to police following his arrest); *Hockenbury v. Sowders*, 718 F.2d 155 (6th Cir.1983) (permissible for prosecutor to point out that defendant's alibi was first offered at trial when defendant's trial testimony was inconsistent with his post-arrest statement that he did not remember where he was at the time the crimes were committed); *United States v. Samples*, 713 F.2d 298 (7th Cir.1983) (prosecutor did not violate *Doyle* when he inquired about and commented on inconsistency between the defendant's trial testimony that he was aware of the criminal activity of a key witness and his post-arrest statement denying any such knowledge); *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651 (7th Cir.), *cert. denied*, 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983) (no *Doyle* violation where prosecutor attacked credibility of defendant's explanation volunteered at trial as to why he had remained silent following his arrest instead of telling police the alibi he testified to at trial.)

The facts of this case are similar to the facts in *Doyle*. As in *Doyle*, Mr. Phelps, following his arrest, did not tell police his version of the events on the night in question but did so for the first time at trial. In *Doyle*, moreover, one of the defendants did make post-arrest statements to the effect "what's this all about" and "you got to be crazy" or "I don't know what you are talking about." *Doyle, supra*, 426 U.S. 615 n. 5, 623 n. 4, 96 S.Ct. 2243 n. 5, 2247 n. 4 (Stevens, J., dissenting). These statements amount to little more than a general denial of guilt. As such, they are remarkably similar to Mr. Phelps' post-arrest statement that he did not commit the crimes charged. Mr. Phelps post-arrest request for a polygraph test is also fully consistent with his general denial of guilt. His request for protective custody, considered in the context of his other post-arrest statements, although somewhat ambiguous, is not inconsistent with his general denial of guilt and is certainly not contrary to his exculpatory trial testimony.

In neither *Doyle* nor the present case, in contrast to *Charles*, did the defendants, following their arrest, give police a selected account of the incident in question instead of clearly relying on their right to remain silent. The defendant's post-arrest statements in *Doyle*, like the petitioner's post-arrest statements herein, were fully consistent with their exculpatory trial testimony.

The Supreme Court in *Doyle* and *Charles* clearly did not intend that a defendant must remain absolutely silent following his arrest in order to invoke the protection of the due process clause. Nor did the Court in *Doyle* treat the defendant's post-arrest comments as a waiver of his right to remain silent. The fact that Mr. Phelps did not remain totally silent following his arrest did not give the prosecutor license to attempt to impeach the petitioner by questioning him about what he did *not* say following his arrest.

Although it is a basic rule of evidence that prior inconsistent statements may be used to impeach the credibility of a witness, when there is no inconsistency, proof of a defendant's silence on a particular subject following his arrest, when he is under no duty to speak, lacks any significant probative value. *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975). The Court in *Hale, supra*, 422 U.S. at 177, 95 S.Ct. at 2137, which based its holding on its supervisory power over federal courts rather than on constitutional grounds, found that when a defendant has been given his *Miranda* warnings, his failure to offer an exculpatory explanation during police interrogation could as easily indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication.

The admissibility of a defendant's refusal to offer an exculpatory version of events following arrest would undermine his exercise of his constitutional right to remain silent. In this situation, jurors, in reality, are quite likely to infer guilt from

his refusal to give a post-arrest explanation to the police. *See Sulie v. Duckworth,* 689 F.2d 128, 130 (7th Cir.1982), *cert. denied,* 460 U.S. 1043, 103 S.Ct. 1439, 75 L.Ed.2d 796 (1983).

◼ Certainly the mere fact that a defendant has made some post-arrest statement, no matter how cursory, does not mean that he has ceased to rely on *Miranda.* The Court in *Miranda, supra,* 384 U.S. at 445, 86 S.Ct. at 1612, recognized that a defendant may assert his right to remain silent at any time during custodial interrogation. When a defendant makes a general denial of guilt following his arrest and the reading of his *Miranda* warnings which is not inconsistent with his trial testimony, as in this case, we cannot say that he was not relying on his *Miranda* right to remain silent following his arrest. The meaning of the defendant's failure to say more following arrest is, as the Court in *Doyle, supra,* 426 U.S. at 617, 96 S.Ct. at 2244, observed, "insolubly ambiguous."

The prosecutor's objectionable cross-examination in the present case did not concern any inconsistency between Mr. Phelps' post-arrest statement and his trial testimony but concerned his silence in not telling the police his exculpatory story following his arrest. The cross-examination was designed to lead the jury to infer the defendant's guilt because he had failed to tell the police his exculpatory story following arrest. Permitting the prosecutor's objectionable question would penalize Mr. Phelps for exercising his right to remain silent under *Miranda.* This is precisely the tactic that the Supreme Court found improper in *Doyle. Id.* at 617–18, 96 S.Ct. at 2244–45.

C. Retroactive Application of *Doyle.*

The state also argues that *Doyle,* decided in 1976 almost two years after the trial in this case, should not be applied retroactively. We disagree.

◼ We begin by acknowledging the general rule that judicial decisions apply retroactively. *Robinson v. Neil,* 409 U.S.

505, 507, 93 S.Ct. 876, 877, 35 L.Ed.2d 29 (1973). Although the Supreme Court has not ruled on the question of *Doyle's* retroactivity, *Charles, supra,* 447 U.S. at 407 n. 1, 100 S.Ct. at 2181 n. 1, the only circuit court of appeals to have expressly ruled on the question, the Fifth Circuit, held that *Doyle* is at least applicable to cases which were on direct appeal at the time of the *Doyle* decision. *Price v. King,* 714 F.2d 585, 588 (5th Cir.1983).

This circuit has previously adopted the view, by way of dicta, that *Doyle* should apply retroactively. *United States ex rel. Smith v. Rowe,* 618 F.2d 1204, 1214 n. 9 (7th Cir.) (app.), *vacated on other grounds sub nom., Franzen v. Smith,* 449 U.S. 810, 101 S.Ct. 57, 66 L.Ed.2d 13 (1980). In addition, the court of appeals of this circuit as well as the courts of appeals of several other circuits have consistently applied *Doyle* retroactively without expressly considering the issue of retroactivity. *See, e.g., United States ex rel. Allen v. Franzen,* 659 F.2d 745 (7th Cir.1981), *cert. denied,* 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 444 (1982); *Morgan v. Hall,* 569 F.2d 1161 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); *Meeks v. Havener,* 545 F.2d 9 (6th Cir. 1976), *cert. denied sub nom., Meeks v. Jago,* 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977).

In determining the retroactivity of constitutional rules in criminal cases, the Supreme Court has considered three criteria: " '(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.' *Stovall v. Denno,* 388 U.S. 293, 297 [87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199] (1967)."

*Solem v. Stumes,* —— U.S. ——, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984); *see also Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). (Special rules which apply in

determining the retroactivity of decisions construing the fourth amendment need not concern us here. *See Stumes, supra,* 104 S.Ct. at 1341 n. 3.)

The first criterion is foremost among these factors. *Brown v. Louisiana,* 447 U.S. 323, 328, 100 S.Ct. 2214, 2219, 65 L.Ed.2d 159 (1980). The Supreme Court has consistently held cases retroactive which go to the heart of the truth-finding function and which are intended to enhance the accuracy of criminal trials. *Stumes, supra,* 104 S.Ct. at 1342–43 (cases cited therein). Controlling significance to the other two criteria is given "only when the purpose of the rule [does] not clearly favor either retroactivity or prospectivity." *Brown, supra,* 447 U.S. at 328, 100 S.Ct. at 2219 (quoting *Desist v. United States,* 394 U.S. 244, 251, 89 S.Ct. 1030, 1034, 22 L.Ed.2d 248 (1969)). The question whether a constitutional right does or does not enhance the truth-finding process at trial is necessarily a matter of degree. *Johnson v. New Jersey,* 384 U.S. 719, 728–29, 86 S.Ct. 1772, 1778–79, 16 L.Ed.2d 882 (1966).

The purpose of the *Doyle* rule is not only to protect a defendant's right to remain silent following arrest, guaranteed by *Miranda,* but to prohibit the prosecutor from making an issue of the defendant's "insolubly ambiguous" post-arrest silence. *Doyle, supra,* 426 U.S. at 617–18, 96 S.Ct. at 2244–45. Thus, *Doyle* is designed not only to safeguard pre-existing *Miranda* rights, but to enhance the truth-finding process by preventing the prosecutor from using a defendant's post-arrest silence for impeachment purposes. Although silence is hopelessly ambiguous under these circumstances, a jury is nonetheless quite likely to infer guilt from a defendant's refusal to tell his exculpatory story to the police following arrest. *See Sulie, supra,* 689 F.2d at 130. Thus, the *Doyle* rule is integrally related to the accuracy of criminal trials and must be applied retroactively. Our conclusion is consistent with the Supreme Court's recognition that the heart of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, considered in its entirety. *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

Nor do we believe that the remaining criteria support a different finding. In considering the reliance factor, the Supreme Court has looked primarily to whether the decision at issue was "foreshadowed" by earlier caselaw or was a "clear break with the past." *Stumes, supra,* 104 S.Ct. at 1343.

Prior to the Supreme Court decisions in *Hale* and *Doyle,* the cases were split as to whether a defendant's silence could be used for impeachment purposes when the defendant took the stand at his trial. *See Hale, supra,* 422 U.S. at 173 n. 2, 95 S.Ct. at 2135 n. 2 (cases cited therein). The court of appeals for this circuit had not ruled on the question prior to *Hale* and *Doyle.*

We believe that the *Doyle* decision was the logical successor to *Miranda, supra,* 384 U.S. at 468 n. 37, 86 S.Ct. at 1624 n. 37, wherein the Court stated:

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation."

The state does not discuss the first two retroactivity criteria but bases its argument against the retroactive application of *Doyle* solely on its conclusory assertion that such application could result in the reversal of many pre-*Doyle* convictions. Although we will not conjecture as to how many convictions might be affected by the retroactive application of *Doyle,* the state has offered us no reason to assume that there have been many trials where the prosecution has attempted to use a defendant's post-arrest, post-*Miranda* warning silence for impeachment purposes. Moreover, the violation of *Doyle* does not mandate reversal when the state can show that the error was harmless. *See* discussion *infra,* p. 820. Finally, as a practical mat-

ter we do not believe that our decision today, coming well over eight years after *Doyle* was decided, will result in an excessive number of challenges to pre-*Doyle* convictions.

We need not decide in the present case whether *Doyle* should be applied to cases which had become final prior to the date of the *Doyle* decision. At the time *Doyle* was decided, Mr. Phelps' conviction was pending on direct appeal to the Indiana Supreme Court. In fact, in its decision the Indiana Supreme Court expressly considered the *Doyle* rule. *Phelps v. State, supra,* 360 N.E.2d at 193–94. Today we hold only that *Doyle* is applicable to cases which were on direct appeal when the new rule was established. We hold, therefore, that *Doyle* is entitled to retroactive application in the present case.

## D. Harmless Error

Our conclusion that *Doyle* is applicable to this case does not, however, end our inquiry. The state contends that any error in the prosecutor's conduct was harmless beyond a reasonable doubt.

The Court in *Doyle, supra,* 426 U.S. at 619–20, 96 S.Ct. at 2245–46, specifically left open the question of harmless error. The Court's language in *Doyle* suggests, however, that the harmless error standard would have been applied had the issue been raised. This court has applied a harmless error analysis in considering *Doyle* violations. *See, e.g., Franzen, supra,* 659 F.2d at 748.

In order to find a constitutional error harmless, a court must be able to declare its belief that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The state has the burden of proving the error harmless. *Id.* The court must consider whether absent the prosecutorial misconduct, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *United States v. Hasting,* 461 U.S. 499, 510–11, 103 S.Ct. 1974, 1981–82,

76 L.Ed.2d 96 (1983); *see also Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963) (state must show that there is no reasonable possibility that the error might have contributed to the conviction). The court must consider the trial record as a whole in making its determination. *Hasting, supra,* 461 U.S. at 509, 103 S.Ct. at 1980. It is not material, in this regard, that there was sufficient evidence upon which the defendant could have been convicted without the disputed evidence. *Fahy, supra,* 375 U.S. at 86, 84 S.Ct. at 230.

Although each harmless error analysis depends on the circumstances of the individual case, it is noteworthy that post-arrest silence due process violations often have been held to be reversible error. *See, e.g., United States v. Shue,* 746 F.2d 1280, 1287–88 (7th Cir.1984); *Franzen, supra,* 659 F.2d at 748; *United States v. Meneses-Davila,* 580 F.2d 888, 895–96 (5th Cir.1978); *Morgan v. Hall, supra,* 569 F.2d at 1168. Reversal in the case of a *Doyle* violation is the norm rather than the exception because this type of violation is so inherently prejudicial. *Williams v. Zahradnick,* 632 F.2d 353, 363 (4th Cir.1980); *United States v. Edwards,* 576 F.2d 1152, 1155 (5th Cir.1978).

While there clearly is sufficient evidence to sustain the conviction of Mr. Phelps, the evidence is not so overwhelming that we are convinced that the prosecutor's cross-examination of the petitioner concerning his post-arrest silence could not have contributed significantly to the guilty verdict. We agree with the district court that the credibility of the petitioner was crucial to his case. There was a sharp conflict between the trial testimony of Mrs. Clem, the prosecuting witness, and Mr. Phelps concerning the incident that occurred during the late night and early morning hours of March 27 and 28, 1974. No other persons testified to having actually seen the sexual encounter between Mrs. Clem and Mr. Phelps that night. Thus, while both the prosecution and the defense called several witnesses to testify to the

events leading up to and following the actual encounter, the case basically turned on the jury's assessment of the relative credibility of the stories of Mrs. Clem and Mr. Phelps.

The prosecution, in support of Mrs. Clem's story, offered evidence that she had suffered various bruises on her body, including bruises around her neck, that she had run to a house in the early morning hours of March 28 terribly frightened and had told the occupant that she had been raped, and that Mr. Phelps had not been seen in the Copy Bar prior to the evening of March 27.

The defense for its part offered testimony that Mr. Phelps and Mrs. Clem had been seen together at the Copy Bar on two occasions prior to March 27, 1974, and that they had been seen leaving the bar together, with Mrs. Clem in her go-go outfit, on one or two previous occasions. If believed, Mr. Phelps' story would have established the existence of consent and thereby disproved essential elements of the crimes of rape and kidnapping. Thus, the issues of guilt and credibility were closely related. In view of the importance of Mr. Phelps' credibility to his case, we cannot say that absent the prosecutor's *Doyle* misconduct, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. *Hasting, supra,* 461 U.S. at 510–11, 103 S.Ct. at 1981–82.

Nor can we say that the petitioner's exculpatory story is transparently frivolous. *See United States v. Shaw,* 701 F.2d 367, 382 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). Although we agree with the state that certain details of Mr. Phelps' story seem unlikely, we do not agree with the state that Mr. Phelps' testimony that he engaged in consensual sexual intercourse with Mrs. Clem in the parking lot of the bar on the night in question was beyond belief. This conclusion is particularly true in light of the evidence offered at trial that Mrs. Clem and Mr. Phelps had previously been seen leaving the bar together and that Mrs. Clem's husband, according to her own testimony on cross-examination, physically abused her frequently.

The state also contends that the trial court's instructions to the jury rendered the error harmless. Following the objection by the defense to the prosecutor's impermissible cross-examination, the trial court admonished the jury by stating, "He [Mr. Phelps] has no obligation to tell the Prosecutor anything," R. 281, and shortly thereafter, "He had no obligation to say anything." R. 282. The Indiana Supreme Court found these admonitions sufficient to cure the *Doyle* violation. *Phelps v. State, supra,* 360 N.E.2d at 194. We cannot agree.

While the trial judge promptly sustained the objection by defense counsel and instructed the jury immediately thereafter that a defendant has the right not to speak to the prosecutor, we conclude that his efforts were not sufficient to purge the taint of the prosecutor's improper cross-examination. The case of *Morgan v. Hall,* 569 F.2d 1161 (1st Cir.), *cert. denied,* 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978), is instructive in this regard. In *Morgan,* the court found a *Doyle* violation when the prosecutor cross-examined the petitioner concerning his post-arrest silence. In the *Morgan* trial, as in the present case, the prosecutor's reference to the defendant's post-arrest silence was brief, isolated, and immediately objected to by defense counsel. The trial court in *Morgan* admonished the jury that the defendant had the right to remain silent; unlike the case at bar, the trial court in *Morgan* expressly instructed the jury to disregard the specific improper questions. *Id.* at 1165, 1167–68. The court in *Morgan* held that the trial court's instructions were insufficient to overcome the prejudicial *Doyle* misconduct. *Id.* at 1167–68. Other circuits, in considering the harmfulness of *Doyle* violations, have expressed similar doubts about the curative power of trial admonitions. *See id.* at 1167 (cases cited therein).

The prosecutor's cross-examination of the petitioner concerning his post-arrest silence was impermissible under *Doyle.*

Having determined that the misconduct was not harmless beyond a reasonable doubt, we affirm the judgment of the district court issuing the writ of habeas corpus.

### OTHER INSTANCES OF PROSECUTORIAL MISCONDUCT

Mr. Phelps has alleged three additional instances of prosecutorial misconduct which he claims violated his constitutional right to a fair trial. In view of our holding that the prosecutor's impermissible cross-examination of Mr. Phelps in violation of *Doyle* is reversible error, we need not consider whether the other instances of alleged misconduct, standing alone, would require reversal of Mr. Phelps' conviction. These additional occurrences, however, do illustrate a pattern of serious prosecutorial misconduct in this case which strongly supports our holding.

The second instance of alleged misconduct occurred while defense counsel was engaged in the voir dire of a prospective juror. During his questioning of the prospective juror, the following colloquy took place:

Q. It's up to a State to prove beyond a reasonable doubt every element of the crime with which the defendant's charged.

A. Right.

Q. And if they fail, then they have not met their burden. Now as Gerald Phelps sits here today, is he innocent or guilty in your mind?

MR. REDWINE: [Deputy Prosecutor] Objection, Your Honor. The law may presume him . . .

BY THE COURT: The law presumes him to be innocent.

MR. JOHN: [Defense Counsel] That is what I was getting at, Judge. I'll rephrase that.

Q. Our law, our system of justice is that as this defendant sits here today, he's innocent and . . .

MR. REDWINE: Your Honor, I still object to that. It is he's presumed innocent. *There's nothing in the law that says he's innocent or he wouldn't be here.*

MR. BUNNER: [Defense Counsel] At this time, the defendant moves to withdraw the submission of this cause for misconduct on the part of the Prosecuting Attorney, and I would like to be heard on that matter.

BY THE COURT: Outside?

MR. BUNNER: Yes.

BY THE COURT: Let's go back in Chambers.

R. 357–58 (emphasis added).

The judge subsequently denied the motion for a mistrial but ordered the prosecutor's offensive statement stricken and directed the jury to disregard it.

The prosecutor's statement, "[t]here's nothing in the law that says he's innocent or he wouldn't be here," was not only highly inflammatory, as the district court observed, but completely misrepresented the presumption of innocence in a criminal trial.

The presumption of innocence is a fundamental component of a criminal defendant's right to a fair trial, guaranteed by the fourteenth amendment. *Taylor v. Kentucky*, 436 U.S. 478, 485–86, 98 S.Ct. 1930, 1934–35, 56 L.Ed.2d 468 (1978). The Constitution guarantees that a defendant will be judged solely on the basis of the evidence introduced at trial and not on the basis that he had been indicted and brought to trial by the state. *Id.* at 485, 98 S.Ct. at 1934. The prosecutor's remark could have been interpreted by the jury to mean that the defendant was guilty merely because he was being tried. The remark demonstrated an ignorance of one of the most basic and important tenets of our system of criminal justice; the presumption of innocence. We need not decide whether this incident of misconduct alone would require habeas corpus relief. It is difficult to believe, however, that Mr. Phelps' right to a fair trial was not significantly prejudiced by the prosecutor's statement.

The third incident of alleged misconduct occurred during the prosecutor's direct examination of Mrs. Clem and involved the following exchange:

Q. Theresa, when Phelps was strangling you when he was raping you, did he leave any marks on your neck?

A. Well, when I was at the lady's house to call, I had some ... my neck was hurting, and I asked them was there any marks there—.

MR. BUNNER: Now, I am going to object as to any conversation she had with some woman, as yet unidentified.

A. And doctors also—.

MR. BUNNER: And I would ask that the Court admonish the witness.

MR. REDWINE: I don't think that the witness needs to be admonished. I think she's been punished enough.

MR. BUNNER: Now, at this time, if the Court please, the defendant moves for withdrawal of the submission of this cause from the jury for misconduct, continued misconduct on the part of Mr. Redwine in making comments in front of the jury. I think this is highly improper and highly prejudicial, and it is designed for that purpose, and that purpose alone.

MR. REDWINE: I have a response I would like to make to that. *I think this witness is scared, is hurt, has a lot that she cannot testify to out of fear; that she does not need to be admonished; that she certainly has been punished;* and I think it's certainly ungentlemanly of Mr. Bunner to say she needs to be admonished when I think Mr. Bunner needs to be admonished.

MR. BUNNER: I renew at this point for misconduct on the part of the Prosecuting Attorney, my motion for withdrawal of the submission for the reason that any admonishment by the Court to the jury could not be sufficient to change the error and wipe those statements from their mind.

BY THE COURT: Mrs. Clem, the law prohibits the use of hearsay. Hearsay is what somebody else told you. You can't say what somebody else has told you, it's inadmissible. The persons who said it would have to be called as witnesses to testify directly. There is very good reasons why that's the law. The motion for mistrial will be overruled, but the jury will be strongly admonished to disregard the remarks of counsel for the State, which I think were slightly prejudicial, and I hope you will disregard it.

R. 120–21 (emphasis added).

■ It is well-established that a prosecutor may not suggest to the jury that other evidence not introduced at trial supports a guilty verdict. *United States v. Fearns,* 501 F.2d 486, 488–89 (7th Cir.1974); *see also United States v. Roberts,* 618 F.2d 530 (9th Cir.1980); *United States v. Garza,* 608 F.2d 659 (5th Cir.1979). A criminal defendant's right to confront the witnesses against him, an essential component of a fair trial, is guaranteed by the sixth amendment, applicable to the states through the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965). In addition, a prosecutor's unfounded references to a prosecution witness' fear of being harmed by the defendant are prejudicial and impermissible. *United States v. Rios,* 611 F.2d 1335, 1342–43 (10th Cir.1979); *United States v. Peak,* 498 F.2d 1337, 1339 (6th Cir.1974).

■ The prosecutor's challenged comment in this instance implied that other evidence which supported the guilty verdict was not presented to the jury because of Mrs. Clem's fear of the petitioner. Despite the trial judge's strong admonition to the jury to disregard the comment, the effect of the objectionable comment could only have been prejudicial to Mr. Phelps' case. The prosecutor's remark exhibits a blatant disregard for the petitioner's right to a fair trial which cannot be ignored.

The final incident of alleged misconduct concerns the following statement made by the prosecutor during his closing argument:

MR. REDWINE: He tried to kill this woman. Now, this case may be the most important thing you ever do in your lives for this community, and *I wouldn't ask anybody to send anyone to prison for life unless I thought it was richly deserved, and unless I thought it was necessary for this community —*.

R. 448 (emphasis added). The trial court denied defense counsel's motion for a mistrial based on this comment.

■■■■■ It is improper for a prosecutor to express his personal opinion on the merits of a case. *Rios, supra,* 611 F.2d at 1343; *Garza, supra,* 608 F.2d at 663; *see also* A.B.A., Code of Professional Responsibility, D.R. 7-106(C)(4). The prosecutor's statement of personal opinion that convicting the defendant was "necessary" and "richly deserved" went beyond the scope of proper argument. When such statements are made by a public prosecutor, they are all the more disturbing because the official status of the speaker carries with it "an implicit stamp of believability." *Hall v. United States,* 419 F.2d 582, 583–84 (5th Cir.1969).

## CONCLUSION

■■■■ We recognize that the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial and not the culpability of the prosecutor. *Smith v. Phillips, supra,* 455 U.S. at 219, 102 S.Ct. at 947. At the same time, we are cognizant of the prosecutor's spe-

cial responsibility to avoid "improper suggestions, insinuations, and, especially, assertions of personal knowledge...." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). The prosecutor in this case seriously failed to meet his responsibilities.

■■■■ This case is not one where there has been merely an isolated instance of prosecutorial indiscretion. Rather, the prosecutor in this case engaged in repeated egregious misconduct which, considering the record as a whole, denied the petitioner due process. Accordingly, we affirm the judgment of the district court granting the petition for a writ of habeas corpus. The ninety-day period within which Mr. Phelps may be retried shall commence on the date of the issuance of the mandate in this action.

CUDAHY, Circuit Judge, concurring.

I agree fully with Judge Gordon's painstaking analysis and with the conclusion which flows from it. I recognize this as a close case for a number of reasons, including both the trial judge's efforts to insulate the jury from error and the possibility that error was harmless. Nevertheless, the state has been unable to establish that the error was harmless beyond a reasonable doubt.[1]

The *Doyle* violation was clear and, if it is to be ignored in a case like this, the assurance to an accused that he has a right to remain silent is empty and dishonest, *see Doyle,* 426 U.S. at 618, 96 S.Ct. at 2245. The ultimate issue in this case is how

---

1. In this sort of case, above all, where the evidence consists almost exclusively of the testimony of the complaining witness and the testimony of the defendant, there is reason to be especially sensitive to questions of the prejudice introduced by counsel for either side. The evidence here, although not perfectly balanced, was also not so obviously one-sided that I can say with any conviction at all that the prosecutor's errors must have been harmless, and that the jury would have convicted without them. The defendant's story was that sex was consensual. Although that story has its odd elements, it is also true that witnesses saw the complaining witness with the defendant on prior occasions; that she entered his car willingly after talking to him earlier in the bar; and that after

she fled from his car he returned to the bar, which seems unlikely if he had reason to believe that she would call the police. On the complainant's side, there is the fact the doctor who examined her that evening indicated that there were bruises on her neck, and the fact that the woman from whose house complainant called the police testified that she was obviously terrified, which seems incompatible with the supposition, for example, that she made the call out of vindictiveness. Aside from these bits of indirect evidence, there is only the credibility of the defendant and the complainant on which to base a decision. Certainly it would be inappropriate for us to suppose, in these circumstances, that *Doyle* error of the sort before us could be treated as harmless.

staunchly *Miranda* and its policies are to be defended by the federal courts. Recent decisions by the Supreme Court indicate a continuing commitment to the *Miranda* policies. If *Miranda* is to remain viable, I see no alternative to taking a principled stand in hard cases like this one.

CUMMINGS, Chief Judge, dissenting.

In this habeas corpus case, we are asked to disagree with the Supreme Court of Indiana which affirmed a sentence meted out by the Superior Court of Vandenburgh County, Indiana. *Phelps v. State*, 266 Ind. 66, 360 N.E.2d 191 (1977), certiorari denied, 434 U.S. 844, 98 S.Ct. 146, 54 L.Ed.2d 110 (1977). Both the majority opinion and the district court have refused to credit the treatment of the prosecutor's statements by the highest court of Indiana. It reasonably concluded that any improper statements by the prosecutor were overcome by the trial court's admonishments to disregard the statements and by its instructions to the jury.

As to the criticized remarks of the prosecutor about innocence during voir dire, the trial court simultaneously told the jury "The law presumes him [defendant] to be innocent" and the jury was immediately told to disregard the prosecutor's statement. The Indiana Supreme Court added:

> Instructions were given the selected jury on the presumption of innocence and that an [criminal] information is not evidence against the defendant.

360 N.E.2d at 193. The prosecutor's statement relied upon by the majority and Judge Brooks was invited by defense counsel's misstatement of the law that "as this defendant sits here today, he's innocent * * *" just after the prosecutor had correctly said "The law may *presume* him [innocent]" (emphasis supplied). Then after the defense counsel's second failure to refer to the presumption of innocence, the prosecutor replied "he's *presumed* innocent. There's nothing in the law that says he's innocent or he wouldn't be here." The last five words were of course in response to defense counsel's reference to "as this de-

fendant sits here today." It is unfitting for us to overrule the Indiana Supreme Court's assessment that the trial judge was within his discretion in not declaring a mistrial over these voir dire remarks, particularly when they were prompted by defense counsel's erroneous reference to innocence and were twice modified by the prosecutor's and trial court's proper emphasis on the presumption of innocence. In any event, out of caution the jury was promptly admonished to disregard the single critical comment. Cf. *Smith v. Phillips*, 455 U.S. 209, 218, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

As to the prosecutor's reference to the complaining witness' fear of testifying fully, the trial judge strongly admonished the jury to disregard the statement. I agree with the state Supreme Court that this was sufficient to cure any harm. Even Judge Brooks conceded that this incident would not warrant granting the habeas corpus petition (App. 19).

As to the prosecutor's question in cross-examining the defendant that it might have been in the defendant's best interests to have told the police and the prosecutor the same story he was telling the jury, an objection was immediately made and sustained. As Justice Hunter noted, the prosecutor was not permitted to repeat the question and it was given no sanction by the trial court. He also pointed out that the defendant "testified during the same sequence of questions that he had protested his innocence to the police on at least two occasions after his apprehension." 360 N.E.2d at 194. In those circumstances, there being no comment on any silence of the defendant, the admonishment given was more than sufficient.

In his closing argument, the prosecutor stated that he would not ask anybody to send anyone to prison for life unless he thought it was richly deserved and necessary for the community. Although the defendant's objection should have been sustained, as the Indiana Supreme Court noted, in the context of the entire closing

argument the statement was not so prejudicial to call for reversal. 360 N.E.2d at 194.

As Justice Hunter pointed out in his opinion for the court, the trial judge halted the prosecutor almost every time he sought to exceed the bounds of propriety and delivered admonishments to the jury. The closing paragraph in the state Supreme Court opinion states the reason why reversal is inappropriate:

> After having reviewed the entire record in this case, we believe it is apparent the prosecutor was constantly seeking to cloud the record with error and was only prevented from this accomplishment by an alert trial judge. We do not condone this variety of prosecutorial activity and an affirmance of this case is not to be considered as condonation of his ill-advised attempts.

360 N.E.2d at 194. Such a rebuke would surely teach this prosecutor a needed lesson, but in any event the culpability of the prosecutor is not "the touchstone of due process analysis." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

If we were reviewing a federal trial the majority opinion might possibly be justified because of our supervisory capacity. On the other hand, under our system of federalism, we should not interject ourselves to overrule state supreme courts' assessments of the effect of prosecutorial misbehavior in the absence of extraordinary circumstances.

Like Judge Brooks, the majority relies principally on *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, that case was recently explained in a *per curiam* opinion in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), "as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." This is not such a case.

In *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980), also dealing with post-arrest silence, Justice Powell pointed out:

> Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadburn rev. 1970). Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative.

Thus it would have been permissible for the Indiana Supreme Court to determine that impeachment by silence did not violate the Fourteenth Amendment unless governmental action had induced the defendant to remain silent before arrest. 447 U.S. at 240, 100 S.Ct. at 2130. But more importantly, the majority and the district court failed to recognize that Phelps did not remain silent at the time of his arrest but denied his involvement in the crimes. It was permissible for the prosecutor to use Phelps' statements against him after his *Miranda* warnings because "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent" (*Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980)) and indeed the *per curiam* opinion in *Anderson* pointed out that *Doyle* was inapplicable in a situation like ours. 447 U.S. at 408, 409, 100 S.Ct. at 2182, 2183.[1]

It should be noted that District Judge Brooks' and the majority opinions favoring the petition for habeas corpus especially focused on petitioner's previous failure to offer the same story at trial as he offered after arrest. But, as seen, the majority opinion and Judge Brooks overlooked the fact that instead of being silent, Phelps told the jury that he had protested his innocence to the police on at least two

---

1. Cases in accord in our Circuit are *United States v. Samples*, 713 F.2d 298, 304 (1983); *United States ex rel. Saulsbury v. Greer*, 702 F.2d 651, 655–656 (1983), certiorari denied, 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983); *Jacks v. Duckworth*, 651 F.2d 480, 483 (1981), certiorari denied, 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300 (1982).

occasions after his apprehension. 360 N.E.2d at 194. Therefore their reliance on *Doyle* for granting the writ was improper.

We were taught by *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974), that the scope of federal habeas corpus review on a claim of prosecutorial misconduct during a state criminal proceeding is generally a narrow one tailored by the Due Process Clause of the Fourteenth Amendment. Since the district judge was wrong in relying on the supposed "denial of defendant's right to silence by the questions asked by the prosecutor in his cross-examination of the petitioner" (App. 22), the principal basis for him and for the majority to grant habeas corpus relief disappears. The trial record reveals that the evidence against Phelps was overwhelming and his story at trial unworthy of belief, so that any prosecutorial misconduct cannot be said to have caused the guilty verdict and was harmless beyond a reasonable doubt.

The judgment of the district court should be reversed.