Gerald Wayne PHELPS,
Petitioner-Appellee,

v.

Jack R. DUCKWORTH, Warden Indiana
State Prison, and Linley E. Pearson,
Attorney General of Indiana, Respon-
dents-Appellants.

No. 84–1052.

United States Court of Appeals,
Seventh Circuit.

Argued June 17, 1985.

Decided Sept. 13, 1985.

Posner, Circuit Judge, filed a concurring opinion in which Easterbrook, Circuit Judge, joined.

Flaum, Circuit Judge, filed concurring opinion.

Easterbrook, Circuit Judge, filed a concurring opinion in which Posner, Circuit Judge, joined.

Cudahy, Circuit Judge, dissented and filed an opinion.

John D. Clouse, Evansville, Ind., for petitioner-appellee.

David A. Arthur, Office of Atty. Gen., Indianapolis, Ind., for respondents-appellants.

Before CUMMINGS, Chief Judge, and BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, COFFEY, FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Chief Judge, with whom BAUER, WOOD, ESCHBACH, COFFEY and RIPPLE, Circuit Judges, join.

Petitioner Gerald Wayne Phelps was convicted in the Superior Court of Vandenburgh County, Indiana, of rape and kidnapping in 1974. He received concurrent sentences of two to twenty-one years and life imprisonment, and his conviction was affirmed unanimously by the Indiana Supreme Court. 266 Ind. 66, 360 N.E.2d 191 (1977), certiorari denied, 434 U.S. 844, 98 S.Ct. 146, 54 L.Ed.2d 110.

In 1978 petitioner sought a writ of habeas corpus in the United States District Court for the Southern District of Indiana. His petition was granted chiefly because of "the denial of defendant's right to silence by the questions asked by the prosecutor in his cross-examination of the petitioner * * *." 582 F.Supp. 401, 410 (1983). On appeal, the judgment of the district court was affirmed in an opinion by Senior District Judge Gordon, Circuit Judge Cudahy concurring and the author of this opinion dissenting. 757 F.2d 811, 824, 825 (1985). The respondent Attorney General and respondent Warden filed a petition for rehearing en banc on the grounds that petitioner was not denied any constitutional rights under Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, because he had not maintained post-arrest silence, and furthermore any Doyle error was harmless in view of the strong evidence against Phelps. Rehearing en banc was granted on May 20, 1985, and we now reverse the judgment of the district court.

The facts of the case were summarized as follows by the Supreme Court of Indiana (360 N.E.2d at 192–193):

The prosecutrix [Mrs. Theresa Clem] was a dancer at a bar in Evansville. Shortly after midnight on March 27, 1974, she left her place of employment on foot. The defendant, who had met her earlier at the bar, drove up alongside her and offered her a ride home. The defendant did not take her to her destination. He forced her to commit fellatio and forcibly raped her in the back seat of his car. The prosecutrix escaped by jumping from the car. She called the police from a nearby home and soon thereafter identified the defendant at the bar where he was apprehended. The defendant admitted sexual intercourse but claimed it was consensual, not forcible.

The jury credited Mrs. Clem's testimony which was initially corroborated by a police officer, a physician, and the owner of the house where she fled after the attack, a Mrs. Nellie Casteel. Mrs. Casteel had never met Theresa Clem prior to the March 28, 1974, incident, and testified that the victim was in a "terrified and scared" condition upon arriving at her house (R. 195). Mrs. Clem was able to lead the police to the site of the rape, a secluded open field, only a few blocks from Mrs. Casteel's house, where tire tracks in the soil and grass were discovered (R. 218). The bartenders of the lounge where Mrs. Clem worked (the Copy Bar) and where Phelps had been that evening and another policeman also corroborated her testimony, identifying the site of the rape as being 5–6 minutes away from the lounge. The bartenders added that they had never seen Mrs. Clem in Phelps' presence prior to March 27, the night of the rape, thus contradicting Phelps. Her injuries were attributable to being choked by Phelps and to jumping from the fast-moving car he was driving.

In his testimony, Phelps admitted that he had previously been convicted of second-degree burglary. He said that Mrs. Clem and he talked at the lounge and she agreed to meet him in a car he had borrowed [1] (which was, of course, unfamiliar to Mrs. Clem). He said that when they were having intercourse in the parking lot behind the lounge, a stranger pulled up in another car and jerked Mrs. Clem out of the car and drove

---

1. Mrs. Clem's corroborated story was that she was going to be driven home by Mrs. Crooks but that the latter's involvement in an argument with a patron of the lounge caused Mrs. Clem to start walking home. It is noteworthy that Phelps' counsel is "not dissatisfied" with respondents' version of the facts (Pet. 1).

off with her while she was screaming and crying. The stranger allegedly caused the victim to fall and thereby sustain injuries. Phelps testified that after his arrest and *Miranda* warnings, he told the police at the station house that he was not guilty of the kidnapping and rape but was nevertheless afraid that he might be killed by Mrs. Clem's husband and therefore asked for protective custody. While he also said that he asked the police for a polygraph test, this was denied by the police officers in question.

In the panel opinion in this case, the majority stated that "this appeal turns on the first instance of alleged [*Doyle*] misconduct," 757 F.2d at 815, and the concurring opinion also rested on an assessment that "the *Doyle* violation was clear * * *." 757 F.2d at 824. Our affirmance is based on the absence of a *Doyle* violation and on harmless error in any event.

## I

*Doyle v. Ohio* involved two petitioners who were arrested and given the warnings dictated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. At their trials, they told exculpatory stories. On cross-examination the prosecutor used each defendant's post-arrest silence for impeachment purposes. The trial court overruled timely objections. On appeal to the Ohio Court of Appeals, the petitioners unsuccessfully asserted that the trial court erred in allowing the prosecutor to cross-examine them about their post-arrest silence. The Supreme Court reversed the convictions, stating "We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. at 619, 96 S.Ct. at 2245.

██ In *Doyle,* after his arrest and *Miranda* warnings petitioner Wood remained completely silent about the alleged marijuana sale. Petitioner Doyle's comments to the narcotics agents after his arrest and receipt of *Miranda* warnings also did not

discuss the offense at that time but merely commented in part, "What's this all about?" and "I don't know what you're talking about." His comments and an additional noncommital one mentioned in the *Doyle* dissent were treated by all members of the Supreme Court as "post-arrest silence" in that they did not refer to the crime charged. In contrast to *Doyle*, Phelps did not remain silent after his arrest and *Miranda* warnings but instead testified at the trial that he had at least twice told the police at the station that he did not commit these crimes (360 N.E.2d at 194), that he had even asked for a polygraph test to show his innocence (360 N.E.2d at 193), and that he had requested protection from Mr. Clem (757 F.2d at 814; R. 277). Moreover, as Judge Brooks' opinion observed, while still at the Copy Bar Phelps "said he denied that he raped the prosecuting witness [Mrs. Clem] when he was approached by a bar employee and informed that the prosecuting witness had made such an accusation in a telephone call" (582 F.Supp. at 403). He never claimed before trial that Mrs. Clem consented to intercourse. Accordingly, it seems clear to us that there was no post-arrest silence in this case. Instead, as we read the record, Phelps told two different stories. Before trial, as we see it, he denied that he had been sexually involved with Mrs. Clem, whereas at the trial he told the completely different story that he was in a car with Mrs. Clem and had sexual intercourse with her, but that it was with her consent. To explain her bruises, he added at trial that some stranger had abducted her from Phelps' car and injured her in so doing. Moreover, unlike the *Doyle* case, when the prosecutor sought to question Phelps about his failure to tell his present elaborate exculpatory story to the police after his arrest, defense counsel made an objection which was twice sustained and the trial court twice admonished the jury that Phelps had no obligation to tell the police or prosecutor anything.

If there were any doubt about *Doyle's* applicability here, it was dispelled by *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct.

2180, 65 L.Ed.2d 222. There the respondent had been convicted of first-degree murder and lost his appeal to the Michigan Court of Appeals. After the district court refused to grant a writ of habeas corpus, the Sixth Circuit reversed (610 F.2d 417), citing *Doyle v. Ohio*. The Supreme Court reversed the judgment of the court of appeals because *Doyle* only "bars the use against a criminal defendant of silence maintained after receipt of governmental [*Miranda*] assurances." 447 U.S. at 408, 100 S.Ct. at 2182. Since Charles had not remained silent when questioned by the police following *Miranda* warnings, the Supreme Court held *Doyle* to be inapplicable.[2] Similarly here, as seen, there was no post-arrest silence by Phelps, so that *Charles* requires reversal of the district court's grant of the writ of habeas corpus to Phelps. Accord from this Circuit: *United States v. Samples*, 713 F.2d 298, 304 (7th Cir.1983); *Jacks v. Duckworth*, 651 F.2d 480, 483 (7th Cir.1981), certiorari denied, 454 U.S. 1147, 102 S.Ct. 1010, 71 L.Ed.2d 300. See also *United States v. Crowder*, 719 F.2d 166, 170–172 (6th Cir.1983), certiorari denied, —— U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825; *Hockenbury v. Sowders*, 718 F.2d 155, 158–159 (6th Cir.1983); *United States v. Dixon*, 593 F.2d 626, 630 (5th Cir.1979), certiorari denied, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82.

Petitioner's cases are not in point. Thus in *United States* ex rel. *Smith v. Rowe*, 618 F.2d 1204 (7th Cir.1980), the defendant remained silent when police came to interview his live-in girl friend in his presence. *United States* ex rel. *Allen v. Rowe*, 591 F.2d 391 (7th Cir.1979), largely involved the issue of pre-arrest silence and is no longer viable in light of the Supreme Court's holding in *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490. In *United States* ex rel. *Ross v. Fike*, 534 F.2d 731 (7th Cir.1976), the defendant remained silent when confronted and identified in a lineup. Finally, in *United States v. Impson*, 531 F.2d 274 (5th Cir.1976), defendant made no statement whatever at the time of his arrest.

## II

■ Impermissible prosecutorial comment regarding post-arrest silence does not require reversal if the court determines it is harmless beyond a reasonable doubt. See *United States* ex rel. *Allen v. Franzen*, 659 F.2d 745 (7th Cir.1981), certiorari denied, 456 U.S. 928, 102 S.Ct. 1975, 72 L.Ed.2d 444 (applying the standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705). The determination must be reached on a case-by-case basis and requires an examination of various factors including:

1. The use to which the prosecution puts the post-arrest silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

*United States v. Massey*, 687 F.2d 1348, 1353 (10th Cir.1982); *Williams v. Zahradnick*, 632 F.2d 353, 361–362 (4th Cir.1980). In light of the brief and solitary nature of the prosecutor's alleged *Doyle* violation, the trial judge's immediate and correct curative admonishment given to the jury, the timely objection of defense counsel preventing Phelps from answering the challenged question, the overwhelming evidence of defendant's guilt revealed by the record and the weakness of his alibi, we conclude that any improper reference to

---

**2.** In support of its ruling in *Charles*, the Supreme Court cited with approval *United States v. Agee*, 597 F.2d 350, 354–356 (3d Cir.) (*en banc*), certiorari denied, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315; *United States v. Mireles*, 570 F.2d 1287, 1291–1293 (5th Cir.1978); *United States v. Goldman*, 563 F.2d 501, 503–504 (1st Cir.1977), certiorari denied, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768.

post-arrest silence here would be harmless beyond a reasonable doubt.[3]

A finding of harmless error is not precluded by the mere fact that defendant offered an alibi at trial, and implausible or highly contradictory testimony offered by the accused has properly been rejected as basis for reversal in this context. See *United States v. Shaw*, 701 F.2d 367, 383 (5th Cir.1983), certiorari denied, — U.S. —, 104 S.Ct. 1419, 79 L.Ed.2d 744; *United States v. Remigio*, 767 F.2d 730, 736 (10th Cir.1985). The following inconsistencies or highly implausible aspects of Phelps' testimony support the Indiana Supreme Court's finding of harmless error (360 N.E.2d 194). First, Phelps testified that the entire incident of consensual relations with Clem, her subsequent abduction, and his return to the Copy Bar elapsed over a period of "ten to fifteen minutes" (R. 255). Mrs. Clem, however, testified that the rape incident transpired over a period of twenty minutes to an hour (R. 124–125), and more significantly, two witnesses, a bartender and a patron of the bar, both testified that Phelps absented himself from the Copy Bar (following Clem's departure) for periods of thirty minutes and thirty to thirty-five minutes, respectively (R. 202, 306). Second, the defendant's own witness, Mr. Donald Smith, testified that he introduced Mrs. Clem and Phelps for the first time approximately two weeks prior to the rape incident (R. 229). Phelps testified, however, that he became acquainted with Clem (via Mr. Smith's introduction) approximately three weeks before the March 28 incident (R. 250). Third, Phelps claimed that a stranger discovered the car in which Mrs. Clem and he were having sexual relations despite the fact that Phelps' car had been borrowed and only his employer and his friend who remained in the bar knew the type of car Phelps was driving that evening (R. 262–265). Finally, it is worth noting the plain implausibility of Phelps' testimony that while he and Mrs. Clem were allegedly having intercourse in the back seat of Phelps' car, Mrs. Clem, lying down beneath Phelps, would raise her head up to look at each car that entered the parking lot (R. 254, 266).

Phelps' story is also discredited by the great difficulty in explaining Mrs. Clem's confirmed appearance, in a terrified state, at the house of a complete stranger, located a significant distance from the Copy Bar parking lot and a short distance from the alleged site of the rape (marked by tire tracks) to which Mrs. Clem was able to lead the police. See *supra* pp. 1411–1412.

Consequently, this Court concurs in the respondent officials' characterization of Phelps' trial testimony as "so implausible on its face that it was unworthy of belief" and as without corroboration (Pet. 2, 12). Even the panel majority opinion admitted that "certain details of Mr. Phelps' testimony seem unlikely" (757 F.2d at 821), and the concurring opinion remarked that his "story has its odd moments" and noted that Mrs. Clem was terrified when she fled to Mrs. Casteel's home and that Mrs. Clem called police from there to report the kidnapping and rape (757 F.2d at 824 n. 1). Those assessments tend to support the State's argument that in such circumstances any *Doyle* error was harmless and certainly did not influence the guilty verdict. See *United States v. Laughlin*, 772 F.2d 1382, 1390–1391, 1392–1393 (7th Cir.1985) (opinion approved but not published) (arguable *Doyle* violation harmless beyond a reasonable doubt where state's evidence overwhelming and defendant's story implausible).

Under similar circumstances the Tenth Circuit recently ruled that the prosecutor's reference to the defendant's post-arrest silence was harmless beyond a reasonable doubt:

> It is true the government chose to pursue a line of questioning delving into defendant's exercise of his right to remain silent, and obviously intended to use the question for impeachment pur-

---

**3.** Since the harmless beyond a reasonable doubt standard is satisfied here, we reserve the question whether a lesser showing might suffice in a case such as this.

poses. In this case, however, the question was asked but once, and it was never answered by the defendant. Timely objection was made and a curative admonishment was given to the jury immediately. Unlike the references to silence in *Doyle* and the other cases cited above, the intensity and frequency of the reference to this defendant's silence was minimal. The record is completely void of any reference to Remigio's post-arrest silence subsequent to the incident discussed above. Finally, the record before us overwhelmingly supports Remigio's conviction.

*United States v. Remigio*, at 735. Contrast *Velarde v. Shulsen*, 757 F.2d 1093 (10th Cir.1985) (*Doyle* violation not harmless beyond a reasonable doubt where there were repeated references to petitioner's post-arrest silence, including during closing argument, defendant's objections to the constitutional error were overruled, the trial was extremely short in duration (thus highlighting the errors), the prosecution's case was entirely circumstantial and there was no corroborating evidence of either side's case). The defendant in *Remigio*, who was charged with the manufacturing of methamphetamines, contended at trial that he was simply unaware of what was being manufactured in his presence, but the Court dismissed his testimony, noting that "the jury obviously found his story incredulous [*sic*]." *Remigio*, at 736.

In assessing the effect of improper prosecutorial comment courts have recognized the greatly reduced possibility of harmful prejudice where the inappropriate remark is isolated and the trial judge provides a quick, firm curative admonishment. See, *e.g., United States v. Suggs*, 755 F.2d 1538, 1541 (11th Cir.1985); *United States v. Milstead*, 671 F.2d 950, 953 (5th Cir.1982); *United States v. Bridwell*, 583 F.2d 1135, 1139 (10th Cir.1978). As noted, *supra* p. 1412, here the prosecutor questioned Phelps only once concerning his failure to previously reveal his exculpatory story, the defense counsel immediately objected, and the trial judge at once sustained the objection and explained that Phelps had no duty to speak,

thus preventing comment on any silence of the defendant. In view of the length of the trial (four days), see *United States v. Bridwell*, 583 F.2d at 1139 (*Doyle* violation harmless where there was a "relatively brief reference in the context of a four-day trial"), in which the government's strong case was substantially corroborated and the defendant's alibi was contradictory and implausible, this type of error must be considered harmless beyond a reasonable doubt.

Judge Brooks and the panel majority considered the supposed *Doyle* violation alone sufficient to warrant the issuance of the writ of habeas corpus even though the Supreme Court of Indiana had disposed of that issue as follows (360 N.E.2d 194):

That [*Doyle*] case is distinguishable, however, in that a prompt objection was sustained and an admonishment given. The prosecutor was not permitted to repeat the question and it was given no sanction by the trial judge. Additionally, the defendant testified during the same sequence of questions that he had protested his innocence to the police on at least two occasions after his apprehension. The admonishment in this case was sufficient to cure the error of the prosecutor.

Nevertheless the district judge and the panel majority of this Court buttressed their conclusion of reversible error by reference to three other instances of alleged prosecutorial misconduct. The petition for rehearing *en banc* did not refer to these episodes and our grant of rehearing was not premised thereon. For the reasons given in the earlier dissenting opinion herein (757 F.2d at 825–826), we agree that none of them, singly or collectively, warranted disturbing Phelps' conviction. At the worst, the four alleged instances of prosecutorial misconduct were harmless beyond a reasonable doubt. This conclusion is especially warranted under the narrow scope of review afforded in a federal habeas corpus case involving a state criminal proceeding that has passed the muster of its highest court on identical grounds. *Donnelly*

*v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431.

The judgment of the district court is REVERSED.

POSNER, Circuit Judge, whom EASTERBROOK, Circuit Judge, joins, concurring.

I hesitate to add to the pile of opinions in this case; separate opinions are the bane of the modern American judiciary. But the case so vividly illustrates the tenuous character of the modern law of federal habeas corpus for state prisoners, and so urgently underscores the need for a fresh approach to the entire subject, that I cannot resist commenting briefly (too briefly to do full justice to an immensely complex area) on what that approach might be, though I am mindful that judges at our level are not empowered to adopt it.

If I were writing on a clean slate I would not reach the question of harmless error in this case even if this were a review not of a state conviction challenged in a federal habeas corpus proceeding but a federal conviction challenged in a direct appeal. As Judge Easterbrook explains, the issue that petitioner Phelps presents with regard to the application of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), is a difficult one within the terms of that decision, which forbids the prosecutor, when the defendant takes the stand and gives exculpatory testimony, to comment on the defendant's failure to have made his exculpatory statement when the police questioned him after his arrest. I hope I shall not be thought disrespectful if I suggest that *Doyle v. Ohio* is a questionable interpretation of the self-incrimination clause. It is very rare for a person who has been arrested and who has a story to tell to fail to tell it at the earliest possible opportunity, in the hope of being released rather than forced to defend against formal charges. See *id.* at 621–22, 96 S.Ct. at 2246 (Stevens, J., dissenting). He may have had a reason for not speaking up then, such as fear that the police would twist his words or a belief that it would be

imprudent to give a statement before consulting counsel, but if so he can give that reason in rebuttal to the prosecutor's effort to impeach his exculpatory testimony; why the impeachment itself should be considered either unfair comment on the veracity of the defendant's testimony or a method of compelling a person to incriminate himself escapes me.

As Judge Easterbrook explains, since *Doyle* the Supreme Court has come around to the view that impeachment by silence is proper, thus leaving as the sole rationale for *Doyle* the fact that it buttresses the requirement of *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966), that the police promise a person whom they interrogate while in custody that there will be no sanctions if he keeps silent. There is a sanction—impeachment by silence—unless that impeachment is forbidden. It does not seem a big enough sanction to get excited about, though, especially since as Judge Easterbrook notes we are at two removes from the self-incrimination clause. The element of sanction is less an argument for forbidding the use of silence to impeach testimony by someone who received *Miranda* warnings than it is an argument against *Miranda*; the criticisms of that decision made years ago by Judge Friendly have yet to be answered. See Friendly, *A Postscript on Miranda,* in Benchmarks 266 (1967).

The case against *Doyle* is even stronger when *Doyle* is invoked, as it is generally and was in the present case, in a federal habeas corpus proceeding brought by a state prisoner. *Doyle* lies at the end of a long chain that connects it to the federal habeas corpus statute, and the intermediate links are (in varying degrees) weak, as well as the final link, *Doyle* itself.

The Habeas Corpus Act of 1867 empowers a federal district court to nullify the conviction of a state prisoner who "is in custody in violation of the Constitution ... of the United States," thus forcing the state to either retry him or let him go. 28 U.S.C. § 2241(c)(3). Until 1953 the general rule was that "for purposes of habeas corpus a detention was not to be deemed 'un-

lawful' if based upon the judgment of a competent state court which had afforded full corrective process for the litigation of questions touching on federal rights." Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 499 (1963). But in the era ushered in by *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), which is the era we find ourselves in today, if a federal constitutional error has been committed in the course of the state proceedings then (with certain qualifications) the federal court can order the prisoner's conviction set aside.

The objections to this position are forcefully argued in Professor Bator's article and need not be repeated here. The reasons why the Supreme Court nevertheless decided to make federal habeas corpus a means of plenary review of constitutional errors in state criminal proceedings appear to have been severely practical. First, the Supreme Court had neither the time, nor under the certiorari jurisdiction the obligation, to review every state criminal conviction in which the defendant raised a colorable claim of federal constitutional error. *Brown v. Allen* in effect delegated much of the Court's review jurisdiction over state criminal convictions to the federal district courts and courts of appeals. Second, at the time *Brown v. Allen* was decided there were doubts about the fidelity of some state courts to the commands of the federal Constitution, and it was feared that those courts might use tendentious findings of fact to defeat federal constitutional claims, that such findings could not be reviewed effectively by an appellate court, and that therefore the factfinding powers of federal district courts had to be available to state prisoners in appropriate cases—which could only be in habeas corpus proceedings.

The first reason is more important today than when *Brown v. Allen* was decided more than 30 years ago and the second less important, but however these changes balance out probably even the Supreme Court itself could no longer return to the earlier regime. *Brown v. Allen* rests on an interpretation of a statute, the Habeas Corpus Act, not of the Constitution; and the Court is reluctant to reexamine its statutory interpretations, which unlike its constitutional interpretations can be corrected by Congress—although, realistically speaking, often only with great difficulty. Moreover, Congress in 1966 made amendments to the Habeas Corpus Act that had the effect of codifying *Brown v. Allen,* see 28 U.S.C. § 2254; its overruling would therefore pull the rug out from under Congress. But all this should not be allowed to obscure the fact that *Brown v. Allen* rests on foundations by no means totally secure.

And accepting that *Brown v. Allen* will remain the law unless and until Congress amends the habeas corpus statute, it still would not follow that Phelps could prevail in this case. He would have to prove a violation of the Constitution, and as an original matter that would not be easy to do. A state may not deprive a person of his liberty without due process of law. But it is not obvious that a prosecutor's comment (if that is what it was in this case) on a defendant's failure to try to exculpate himself when he was arrested denies the defendant due process of law, even expansively construed. To get to such a conclusion one must bring to bear somehow the provision of the Fifth Amendment that "No person ... shall be compelled in any criminal case to be a witness against himself."

The language and history of the Fourteenth Amendment do not suggest that in taking the words of the due process clause from the Fifth Amendment and applying them to the states the framers of the Fourteenth Amendment meant also to apply the Fifth Amendment's self-incrimination clause to the states. But neither is it clear that all that the framers wanted to do was to make sure that state criminal defendants had notice of the criminal charges and an opportunity to rebut them. Such an interpretation would give such defendants no protection against tactics that would make notice and hearing empty formalities. An alternative interpretation views "due process of law" as a compendious summation of the basic elements of fair criminal procedure in Anglo-American jurisprudence. See, e.g., *Palko v. Connecticut,* 302 U.S.

319, 324–25, 58 S.Ct. 149, 151–52, 82 L.Ed. 288 (1937). Among these is the centuries-old principle of not forcing criminal defendants to testify against themselves. Even Thomas Hobbes, staunch defender of authoritarian government though he was, wrote that "if a man be interrogated by the sovereign, or his authority, concerning a crime done by himself, he is not bound, without assurance of pardon to confess it; because no man ... can be obliged by covenant to accuse himself." Leviathan, pt. 2, ch. 21 (1651).

It does not necessarily follow that the states should be bound by every twist and turn of case law embroidering the words of the self-incrimination clause and the other provisions of the Bill of Rights governing procedure in federal criminal trials; it follows only that due process of state law encompasses the essential principle behind the self-incrimination clause. "The due process clause forbids compulsion to testify by fear of hurt, torture or exhaustion," or by "any other type of coercion that falls within the scope of due process." *Adamson v. California*, 332 U.S. 46, 54, 67 S.Ct. 1672, 1677, 91 L.Ed. 1903 (1947) (footnotes omitted). But there is still the problem that the self-incrimination clause speaks of compulsion to testify "in any criminal case," and this case concerns statements made (or not made) out of court, at the police station before any case had been brought. If, however, the clause were limited, as both its language and history imply, see, e.g., *DeLuna v. United States*, 308 F.2d 140, 149 (5th Cir.1962), to testimony inside the courtroom, it would not do much for liberty; the police could beat a confession out of the defendant before the trial started and then put the confession into evidence as an admission and thus circumvent the policy against compulsory self-incrimination. The forms of justice would be observed, but there would be no substance.

Hence it was natural to interpret the clause as reaching a defendant's self-incriminating statement coerced outside the courtroom but used against him inside the courtroom, a step that had been taken in *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897), with respect to confessions put into evidence in federal criminal trials. Early cases involving the states invalidated convictions procured by coerced confessions as denying due process directly, without mention of the Fifth Amendment, see, e.g., *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); later cases based the inadmissibility of such confessions on the principles of the Fifth Amendment, as applied to the states through the due process clause of the Fourteenth Amendment. See *Miranda v. Arizona, supra,* 384 U.S. at 458–67, 86 S.Ct. at 1619–24; Friendly, *supra,* at 270.

The next step was taken in *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), which forbade a state prosecutor to invite the jury to draw an adverse inference from the defendant's failure to take the stand and defend himself. Even ignoring the fact that the jury will draw the inference anyway, regardless of what judge or prosecutor say, I find it hard to see how such an invitation can be thought a means of compelling a person to accuse himself; the pressure it exerts is to give exculpatory, not incriminating, testimony. In any event the connection with the fundamental policy of the self-incrimination clause is sufficiently tenuous to make this an area where the states should be allowed to experiment rather than forced into a federal straitjacket.

The last link in the chain that connects the present case with the Habeas Corpus Act, *Doyle v. Ohio*, originally was linked to the policy against compulsory self-incrimination through *Griffin* as well as *Miranda*. But with the former link severed, *Doyle* now depends just on *Miranda*—the most controversial variation on the theme of self-incrimination.

The chain is too long and has too many weak links to provide a firm basis for federal judicial intervention in the criminal process of the states in a case such as the present one. Bearing in mind the somewhat insecure foundations for nullifying in a federal habeas corpus proceeding a state prisoner's conviction on the basis even of a coerced confession, I am hard pressed to

understand doing so not because a confession was coerced but because the prosecutor pointed out the inconsistency between the prisoner's voluntary, exculpatory testimony in court and his equally voluntary, uncoerced silence when arrested. We are a long way from the Habeas Corpus Act, the due process clause, and the self-incrimination clause. What should have been a loose garment of federal limitations on state criminal procedure has become a stifling corset.

But as the web of technicalities has tightened, inevitably the role of "harmless error" has expanded. Very few judges would think the prosecutor's misstep in this case (if it was a misstep, which is unclear) serious enough to justify setting aside the conviction of a man plainly guilty of a very serious crime, and, fortunately, the doctrine of harmless error is at hand to avoid such an unjust result. Contrary to popular belief, few defendants prevail in federal habeas corpus proceedings even though the procedural rules that the Supreme Court and the lower federal courts have proliferated for the protection of criminal defendants are too numerous and uncertain to be applied correctly in most cases. The concept of harmless error makes the federal courts' commitment to excessive standards for the protection of criminal defendants harmless—or nearly so, for it makes the criminal justice system more expensive to operate, and may provide an escape hatch for criminals in borderline cases and in other cases may improve their position in plea bargaining. But the concept of harmless error—or, rather, as Judge Easterbrook emphasizes, concepts—does not help make constitutional criminal procedure simple or understandable.

As I said earlier, I regard the basic structure of federal habeas corpus as beyond correction by any court and view with some sympathy the argument for a flexible interpretation both of due process of law in the Fourteenth Amendment and of compulsory self-incrimination in the Fifth Amendment. It is true that a powerful argument against *Brown v. Allen* and hence against plenary review on federal habeas corpus of constitutional errors in state criminal trials can

be built from Professor Bator's article of two decades ago and from Justice Jackson's concurring opinion in *Brown v. Allen,* see 344 U.S. at 532–48, 73 S.Ct. at 423–431, though an argument which today can be made only to Congress. It is also true that the process by which it has come to be accepted that a state criminal defendant can get his conviction set aside by a federal district court if the state convicted him by means of a confession that had been coerced out of court is not so obvious as might appear to someone familiar only with recent judicial decisions; yet I have no serious quarrel with this result. But if I had my druthers (which emphatically I do not) I would stop there, and decide this appeal on the simple ground that the prosecutor's comment on what Phelps said and failed to say at the police station cannot sensibly be viewed as a method of coercing an out-of-court confession. No pressure was brought to bear on Phelps to confess and he did not confess or make damaging admissions. That ought to be the end of the case. I look forward to the day when the Supreme Court will simplify constitutional criminal procedure and allow us to decide cases such as this on common-sense grounds, rather than making us dance an elaborate quadrille that finds us however in the same place when the music stops—with a conclusion that the defendant is not in custody in violation of the Constitution.

FLAUM, Circuit Judge, concurring.

As an intermediate appellate court judge obliged to follow the contemporary and controlling teachings of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), I am compelled to find that a *Doyle* violation occurred in this case. I therefore respectfully limit myself to registering a dissent from Part I of the majority's opinion and a detachment from the broad-ranging reflections contained in the concurring opinions of my brothers Posner and Easterbrook. The record in this case reflects that petitioner Phelps made a few brief comments after his arrest and receipt of *Miranda* warnings, but made no statement that was inconsistent with the version of events he later related at trial. *Cf. Ander-*

son v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (*Doyle* not violated by cross-examination that merely inquires into defendant's prior inconsistent statement). The prosecutor's questioning of Phelps thus referred to Phelps's post-arrest silence, in direct violation of *Doyle*.

Nevertheless, the record also demonstrates that Phelps's testimony lacked credibility in certain critical respects, as outlined in the majority's opinion, and that the trial court gave a clear, prompt, curative instruction to the jury, *cf. United States ex rel. Miller v. Greer*, 772 F.2d 293, 298–299 (7th Cir.1985). I thus conclude that under the standard for assessing federal constitutional error mandated by the Supreme Court in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the *Doyle* violation in this case was rendered harmless beyond a reasonable doubt. I therefore concur in the majority's reversal of the district court's judgment.

EASTERBROOK, Circuit Judge, with whom POSNER, Circuit Judge, joins, concurring.

I join Part II of the majority's opinion and the judgment. Part I resolves a close and difficult issue that I think the court need not confront.

Under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *An-*derson v. Charles, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), a prosecutor may not impeach a defendant by showing that his testimony at trial is inconsistent with his silence at the time of arrest after the defendant received *Miranda* warnings. *Charles* also holds however, that when a defendant speaks after being arrested, the prosecutor may impeach the defendant by pointing out the difference between the story he told to the police and the story he tells to the jury. Like the state courts, I assume that the police gave Phelps the warnings required by *Miranda*. The central question the majority resolves in Part I therefore is whether the prosecutor tried to impeach Phelps with prior inconsistent statements (permissible) or prior silence (impermissible).

The Supreme Court of Indiana concluded that the prosecutor was trying to impeach Phelps by pointing to his silence. *Phelps v. State*, 266 Ind. 66, 360 N.E.2d 191, 193–94 (1977). There is much support for that conclusion. Phelps said a few things after his arrest. He denied responsibility, he asked for protection from attack, and he volunteered to take a lie detector test. But he said nothing about the details of the offense.* After the colloquy set out in the footnote, the prosecutor asked: "Well, do you think it might have been in your best interests to have told the police and the

---

* Phelps and the arresting officer told slightly different versions of what Phelps said. According to the officer, Clem pointed to Phelps in the bar and accused Phelps of raping her. The officer testified that Phelps "stated I didn't do it." The officer did not recount anything else Phelps may have said. Phelps himself testified that his statements were made at the stationhouse rather than the bar and were more extensive:

Q. You told them you didn't do it?
A. That's right.
Q. Is that all you told them?
A. I said I'd like to talk to somebody because I was afraid I was going to get killed.
Q. By whom?
A. Her husband.
Q. Think that her husband might have been angry about that?
A. I thought maybe that was who it was.
Q. And did you tell anybody else about the rape?

A. Pardon, sir?
Q. Did you tell the policemen about the rape?
A. About the rape?
Q. Did you say anything except I didn't do it?
A. I just asked to talk to someone for some protective custody, what I wanted.
Q. I want to get this very clear, Mr. Phelps. Is the only thing you said to the police, I didn't do it, and I need protective custody because I think her husband might kill me?
A. They took me down ... then took me down there and put me in a room where they take all your belongings and everything. I sat there on a bench, and I was supposed to be sitting there waiting for Detective Hollis, and then I went downstairs to a lab where they gave me some tests. I came back up there and the policeman ... I was talking to the policeman that was up here yesterday, the last one that testified, and he got his gun out showing me his gun; and I asked him, I said, well, I think I

Prosecutor's Office this story you're telling this jury?" Counsel for Phelps objected, and the trial judge brought the inquiry to a halt.

It is difficult to understand the prosecutor's question as an effort to impeach Phelps by pointing to an earlier, inconsistent version of events. Phelps's defense was consensual intercourse, and he testified at trial that someone had yanked Clem from the car while things were in progress. If that someone was her husband, known from other testimony to be violent, Phelps easily could have been afraid. He could have asked for protective custody and a lie detector test. The prosecutor's question seems to impeach Phelps by asking why he did not tell *more* than he did to the police.

Certainly there is a fine line between impeachment by showing a curious incompleteness in a suspect's story and impeachment from silence. *Doyle*, for example, treats "what's this all about?"—the equivalent of "I didn't do it"—as silence rather than a prior inconsistent story. See 426 U.S. at 614–15 n. 5, 96 S.Ct. at 2243 n. 5. That is why this is a difficult case on the merits. If the prosecutor had been permitted to continue, he might have established some inconsistency between what Phelps told the police and what he said at trial. If Phelps wanted protective custody, why did he not give the police the reason he offered at trial? As an original matter of constitutional interpretation it is difficult to see why the information that Phelps told an incomplete story to the police is not a legitimate ground for an inference. But given *Doyle* we cannot easily answer the question posed here.

I therefore prefer the conclusion in Part II, which holds that even if the prosecutor's question was impermissible, the events were harmless. The trial court cut the prosecutor short. The judge did not permit Phelps to answer, and twice he told the jury that Phelps "had no obligation to say anything." There was no judicial error in this case. There was at most a brief, and quickly aborted, episode of misconduct by the prosecutor. The objection was sustained. It is highly unlikely that the single brief question, followed by prompt and accurate advice from the judge that Phelps "had no obligation to say anything," affected the outcome of this trial. Cf. *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Remedies short of the declaration of a mistrial are sufficient to handle episodes of this sort. Part II of the majority's opinion therefore establishes "beyond a reasonable doubt" that the prosecutor's question did not affect the outcome in this case. The misconduct was harmless under the most stringent test for harmless error.

Part II properly reserves the question whether the "reasonable doubt" standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), necessarily applies to a case such as this. Every court that has applied a harmless error test to a *Doyle* problem has assumed that *Chapman* supplies the appropriate standard. Not one case discusses why. I believe the appropriate standard to be an open question and explain why the common assumption is not the only tenable analysis.

Prosecutorial misconduct that is thwarted by a court usually is addressed under the standard of *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)—whether the improper behavior "had substantial influence" on the course of the trial. Cf. *United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 1046–49, 84 L.Ed.2d 1 (1985). The *Chapman* standard is designed for constitutional errors that could affect the

---

better talk to someone because I'm scared. I said I don't know what's going to happen. I don't want to be released tonight, I didn't know what they was going to do. . . .

Q. Now, I want you to be very sure about this. Is that all you said?

[Objection made and overruled.]

A. I did say I would submit to a polygraph test if they wanted to give me one.

[Some extraneous questions omitted.]

Q. Well, then, am I to assume, Mr. Phelps, that that is all you said to the police?

A. Other than, you know, just normal conversation.

Q. But nothing about the crime?

A. No, sir. We talked about a wreck that I had, and that's about it.

process of determining guilt or innocence. Oversteps and missteps by the prosecutor do not require such close scrutiny. The question then becomes whether an unsuccessful attempt to violate the rule of *Doyle* is closer to ordinary prosecutorial error or is itself a "constitutional" error within the meaning of *Chapman*.

What happened in this case did not threaten the conviction of an innocent person or directly violate any constitutional right. Some language in *Doyle* suggests that prior silence is too ambiguous to support impeachment, and therefore that impeachment from silence undermines the truth-finding function of the trial. More recent cases, however, imply that this concern is not a part of the foundation of the rule of *Doyle*. *Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). These cases conclude that once a defendant takes the stand, the prosecutor may use the defendant's silence at the time of arrest as a basis of impeachment. Impeachment by prior silence is an established, permissible technique that increases the probability that the judgment in the case will be accurate. *Raffel v. United States*, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926). According to *Jenkins* and *Fletcher*, the rule of *Doyle* applies only if the defendant was given *Miranda* warnings, and then only for silence after the warnings inform him implicitly that silence will not be used against him. Unless the defendant receives this assurance, the ordinary rule permitting impeachment by silence prevails.

The rule of *Doyle* therefore now rests not on any difficulties with impeachment on the basis of prior silence but on a belief that defendants ought not to be bushwacked if they rely on the advice implicit in *Miranda* warnings that exercise of the right to remain silent will not come back to haunt them. *Miranda* warnings themselves are not direct commands of the Constitution but a set of rules designed to reduce the likelihood of subtle coercion of someone in custody. *Oregon v. Elstad*, —— U.S. ——, 105 S.Ct. 1285, 1291–93, 84 L.Ed.2d 222 (1985); *Michigan v. Tucker*, 417 U.S. 433, 442–46, 94 S.Ct. 2357, 2363–65, 41 L.Ed.2d 182 (1974). *Doyle* is therefore a prophylactic rule designed to increase the efficacy of another prophylactic rule, and a prosecutor's thwarted effort to violate *Doyle* is removed three times from the constitutional prohibition of compulsory self-incrimination. We need not resolve today whether a federal court should apply *Chapman* to misconduct so far removed from the core of the constitutional rule. It is enough for now to observe that there is a strong argument that it need not.

CUDAHY, Circuit Judge, dissenting.

I respectfully dissent and rely on the careful panel opinion by Judge Gordon in this case, *Phelps v. Duckworth*, 757 F.2d 811 (7th Cir.1985), as well as my concurring opinion there, 757 F.2d at 824.

The majority here has undertaken a wholly unprecedented extension of the exception to *Doyle v. Ohio* which provides for impeachment of a defendant's testimony through statements made by him after his receipt of *Miranda* warnings. Here there was no inconsistency or conflict between the brief remarks Phelps made after his arrest and what he testified to at trial. *See Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980). Therefore, the purpose of the prosecutor's question was not to impeach the latter with the former, but merely to draw an inadmissible inference from the defendant's essential silence after having been given the warnings. Unfortunately, *Doyle* suffers major erosion from today's decision.

The majority has labored mightily to show some sort of contradiction between a cursory denial of *rape* (and that is *all* the defendant ever denied) and detailed testimony at trial about consensual sexual intercourse. There is absolutely no basis for the majority's claim that Phelps, before trial, "denied that he had been sexually involved with Mrs. Clem...." [1] At 1412.

---

1. The majority says, "[Phelps] never claimed before trial that Mrs. Clem consented to intercourse." At 1412. Of course, this failure to tell his story is the very *silence* which the prosecutor is seeking to use against Phelps. I do not under-

*See* at 1420–21 n. * (Easterbrook, J. concurring) (setting forth what officer and Phelps testified Phelps said). Phelps denied that he *raped* Clem, which is an entirely different matter, and the majority cites nothing to support any claim broader than that. Since consent is a complete defense to a charge of rape, I do not understand on what basis there is any contradiction or inconsistency between a terse pre-trial denial of rape and trial testimony about consent. For consent is presumably the defense pursued in a great many—possibly most—rape cases. In addition, I am certain that most people, confronted with a denial of rape, would not take such a denial as a representation that sexual intercourse did not take place. Consensual sexual intercourse is not a lesser included offense of rape. For these reasons, the majority's effort to find an exception to *Doyle* must fail.[2]

I am also intrigued by the ease with which my brethren find error here to be harmless. The credibility of two people is the essence of a great many rape cases, including this one, and I rely on Judge Gordon's panel opinion, my concurrence there and on Judge Brooks, who heard the witnesses, for an analysis of the harmlessness point as it involves credibility.

---

stand the majority's reasoning that because "[Phelps] never claimed that Mrs. Clem consented to intercourse.... [T]here was no post-arrest silence...." At 1412.

2. Judge Flaum's special concurrence, of course, clearly supports this view. Judge Easterbrook's special concurrence, in which Judge Posner joins, is also essentially supportive.