45 F.3d 428
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Trent HAWTHORNE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Andre Monroe SMITH, Defendant-Appellant.
 Nos. 94-5282, 94-5283.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1994.
Decided Jan. 10, 1995.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Newport News. Henry C. Morgan, Jr., District Judge. (CR-93-108)
 ARGUED: Deborah S. Roe, MCDERMOTT, ROE & JONES, Hampton, VA, for Appellant Smith; Willard Montellous Robinson, Jr., HALL, FOX, ATLEE & ROBINSON, P.C., Newport News, VA, for Appellant Hawthorne. Robert E. Bradenham, II, Assistant United States Attorney, Norfolk, VA, for Appellee. ON BRIEF: Helen F. Fahey, United States Attorney, Norfolk, VA, for Appellee.
 E.D.Va.
 AFFIRMED.
 Before HALL, WILKINSON, and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Trent Hawthorne appeals his convictions for conspiracy to distribute crack cocaine, possession of the crack with intent to distribute, and use of a firearm during and in relation to a drug trafficking offense.[1] He also appeals his sentence. Andre Smith appeals his convictions on the conspiracy and firearm counts. We affirm all of the convictions and Hawthorne's sentence.
 
 I.
 
 2
 This prosecution sprang from a state investigation of an attempted murder. On June 12, 1993, Paul A. Whitlow, Jr., became embroiled in a traffic dispute with three men in a maroon Honda near Poquoson, Virginia. After Whitlow became convinced that the Honda was following him, he headed for the Poquoson police station. As Whitlow neared the station, someone in the Honda fired three shots at his car; one of the slugs entered the back of Whitlow's seat at shoulder blade level and penetrated three-quarters of the way through. The Honda sped away.
 
 
 3
 Whitlow proceeded to the station and reported the incident. He provided a complete description of the Honda and recited its plate number. Whitlow described the Honda's driver as a light-skinned black male with bright, greenish eyes.
 
 
 4
 Charles Buffington, Poquoson's lone investigator, handled the case. He checked the plate number that Whitlow had provided and discovered that it matched a maroon Honda registered to Barbara Simmons of Newport News. On June 23, Buffington went to Simmons's apartment and spoke with her and her husband. According to Buffington's testimony at the suppression hearing, Mr. Simmons said that he had given the Honda to Hawthorne and Smith around May 15. He explained that he had agreed to sell the car to the pair and allowed them to drive it as long as they made periodic payments. Buffington asked whether either Hawthorne or Smith was a light-skinned black male with green eyes, and Mr. Simmons replied that Hawthorne fit that description. Mr. Simmons told Buffington that the two lived at 40 Betty Lee Place in Newport News.
 
 
 5
 Buffington drove to 40 Betty Lee Place, a townhouse in a development called Wood Edge Apartments. The maroon Honda was the middle of three cars parked in front of the townhouse, which was situated among a row of similar dwellings. Buffington stationed himself about forty to fifty feet away from the parking area and took some photographs. As he watched, a light-skinned black male exited the townhouse and strode toward a spot between the driver's side of the Honda and the passenger side of the car to its left. After walking to within approximately ten feet of the vehicles, the man turned around and went back inside; Buffington could not discern the color of the man's eyes.
 
 
 6
 Buffington left and applied to a local magistrate for a warrant to search the Honda and the townhouse for the gun used in the June 12 shooting. Buffington filled out a form application, which doubled as an affidavit. Buffington averred that the car used in the shooting and a person who "match[ed]" the description of one of the car's occupants had been "found" at the townhouse. Although the application noted the Simmonses' explanation of how a man named Trent Hawthorne had come into possession of the Honda, it neglected to mention their confirmation of Hawthorne's description or their role in providing Hawthorne and Smith's address. The application did not otherwise identify the basis for Buffington's assertion that the person he saw emerge from the townhouse matched Whitlow's description of the Honda's driver during the June 12 incident.
 
 
 7
 The magistrate issued the warrant and Buffington drove back to 40 Betty Lee Place. The townhouse was dark and the Honda was gone; Buffington returned the warrant unexecuted. He waited almost a week to apply for a fresh warrant. On June 29, Buffington submitted a new application to the magistrate which provided the additional information that "[t]he registered owner has loaned the [Honda] to a light skin [sic] black male with bright green eyes." However, the new application was, like its predecessor, mum as to how Buffington had obtained Hawthorne and Smith's address.
 
 
 8
 A different magistrate issued a new search warrant that afternoon, and Buffington, assisted by Newport News police, executed it. The townhouse's sole occupant, Ericka Robinson, opened the door for the officers. Robinson was visiting her boyfriend, Troy Holt, who had been living at the townhouse with Hawthorne and Smith.
 
 
 9
 While searching an appliance alcove in the downstairs hallway, Officer Randy Butschillinger discovered a large, zippered gym bag. Inside was a small firesafe; Butschillinger used a large screwdriver to pry it open. Along with some bills and other assorted papers, the safe contained a paycheck that had been made out to Hawthorne, nine grams of crack inside a plastic baggie, and two automatic pistols with ammunition. One of the pistols was a .380 that was ultimately determined to have been used in the June 12 shooting. An ammunition clip bearing Hawthorne's fingerprint had been inserted into the .380.
 
 
 10
 About an hour after the search had commenced, Holt arrived at the townhouse on foot. He told the officers that the items in the safe belonged to Hawthorne and Smith and that they had just dropped him off outside. The police quickly stopped the yellow Monte Carlo in which Hawthorne and Smith were riding and brought the pair back to the townhouse.
 
 
 11
 Butschillinger testified that, upon Hawthorne and Smith's return, he placed them under arrest and read them a standard version of the Miranda[2] warnings. Each man indicated that he understood his rights and would not mind answering some questions. Butschillinger described the gym bag and asked Hawthorne whether it belonged to him. Hawthorne affirmatively nodded his head. Butschillinger then described the firesafe and asked Hawthorne whether it also was his. Hawthorne did not respond to the question, either verbally or otherwise; he simply stared straight ahead. Hawthorne said nothing else until he was booked, and then answered only routine questions concerning his identity.[3]
 
 
 12
 At trial, Holt testified against Hawthorne and Smith in exchange for immunity from prosecution. Upon conviction, Hawthorne was sentenced concurrently on the conspiracy and possession counts to eighty-seven months of imprisonment. He received a consecutive sentence of sixty months for the firearm conviction.[4] Smith was sentenced on his two counts of conviction, including the firearm charge, to 123 months in prison. Both appeal their convictions, and Hawthorne appeals his sentence.
 
 II.
 
 13
 Both appellants contend that the June 29 search warrant was defective because Buffington's application was insufficient to establish probable cause to believe that the gun used in the June 12 shooting would be found on the townhouse premises. They maintain that the resultant search was illegal and that the district court therefore erred in failing to grant their motion to suppress the search evidence.
 
 
 14
 In a nutshell, the appellants' position is that the June 29 application did not establish sufficient identity between anyone who might have been driving the Honda and an occupant of the townhouse. See United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir.) ("In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched.") (citation omitted), cert. denied, 114 S.Ct. 485 (1993).
 
 
 15
 Absent the address information provided by the Simmonses, the argument goes, the only link between the Honda and the particular townhouse at issue was that Buffington saw a light-skinned black male (with eyes of indeterminate color) exit the dwelling and approach the car. Further, according to the appellants, any legitimate inference that the Honda's operator lived at the townhouse had been attenuated by Buffington's failure to again observe the presence of the vehicle (or a light-skinned black male) there during the six days prior to the application date. Finally, though the magistrate issued the search warrant despite the application's supposed insufficiency, the appellants insist that the warrant is not saved by the good-faith exception to the exclusionary rule, see United States v. Leon, 468 U.S. 897 (1984), because Buffington's delay in submitting the second warrant application and certain inconsistencies between it and the one he submitted on June 23 allegedly demonstrate his reckless disregard for the truth of the information that he provided to the magistrate. Id. at 923 (citing Franks v. Delaware, 438 U.S. 154 (1978)).[5]
 
 
 16
 We disagree with at least this latter contention. The rule is that, in the absence of an allegation that the magistrate abandoned her detached and neutral role, suppression of evidence obtained via a search warrant is appropriate only if the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false if not for a reckless disregard of the truth. Leon, 468 U.S. at 923; Lalor, 996 F.2d at 1583. Suppression may also be had if the officers executing the warrant "could not have harbored an objectively reasonable belief in the existence of probable cause." Leon at 926; Lalor at 1583.
 
 
 17
 Even if we assume that the statements at issue in the June 29 application, see note 5, supra, are "false," they are not of sufficient materiality to have misled the magistrate in any way.[6] Further, even if the delay in obtaining the second warrant did somewhat attenuate the nexus between the Honda and the townhouse, the warrant "is not so lacking in probable cause that the officers' reliance upon it was objectively unreasonable." Lalor, 996 F.2d at 1583 (applying the second part of the Leon test).
 
 III.
 
 18
 At trial, Hawthorne's nonverbal acknowledgment that he owned the gym bag was admitted into evidence, as was his subsequent silence when asked about the firesafe. Hawthorne contends that the admission into evidence of his silence violated his Fifth Amendment privilege not to incriminate himself.
 
 
 19
 There is nothing in the record to indicate that the district court clearly erred in finding as fact that Hawthorne was informed of his right to remain silent and then waived that right. Moreover, it is settled that one's failure to affirmatively deny an allegation that a reasonable person would, if untrue, ordinarily deny is a "statement" that may be introduced into evidence as a party admission. See Fed.R.Evid. 801(d)(2)(B).
 
 
 20
 Where an accused has waived his right to silence and talked to the police, evidence at trial of his inability or refusal to respond to certain questions has consistently been held not to violate the Fifth Amendment. United States v. Goldman, 563 F.2d 501, 503-04 (1st Cir.1977), cert. denied, 434 U.S. 1067 (1978); United States v. Mitchell, 558 F.2d 1332, 1334-35 (8th Cir.1977); United States v. Moore, 484 F.2d 1284, 1286 (4th Cir.1973).[7]
 
 
 21
 The above-cited authorities appear to lay Hawthorne's argument to rest. However, his situation is arguably distinguishable because the government sought to ascribe meaning to a post-waiver silence that, contrary to the above cases, was maintained until trial. In other words, Hawthorne's contention that his Fifth Amendment privilege against self-incrimination was violated is correct if his sustained silence was a reassertion of that privilege. See Miranda, 384 U.S. at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.") (emphases supplied).
 
 
 22
 Though at least two courts have held that something more than mere silence is required to effect a valid reassertion, see Pitre, note 7 supra, 960 F.2d at 1124-25; Perkins v. Grammer, 838 F.2d 294, 295 (8th Cir.), cert. denied sub nom. Perkins v. Clarke, 487 U.S. 1220 (1988), we decline to decide the question because we are satisfied that the admission into evidence of Hawthorne's silence regarding ownership of the firesafe was, if error, harmless beyond a reasonable doubt. See United States v. Massuet, 851 F.2d 111, 114 (4th Cir.1988) (citing Williams v. Zahradnick, 632 F.2d 353, 361-62) (4th Cir.1980)), cert. denied sub nom. Trujillo v. United States, 488 U.S. 1005 (1989).
 
 
 23
 Hawthorne's silence regarding the safe was, if regarded by the jury as a tacit admission of his ownership, relevant to show that he had exercised dominion and control over its contents, including the guns and the drugs. Even absent the evidence of his silence in the face of Butschillinger's question, the jury could easily infer that Hawthorne constructively possessed any or all of the safe's contents because at least two of the items found therein--the paycheck made out to him and the ammunition clip with his fingerprint--were powerful indicia of Hawthorne's presence.[8] Thus, we cannot see how Hawthorne was prejudiced in any way by Butschillinger's testimony regarding the former's silence, and we must conclude that the introduction of that testimony was, at the very most, harmless error.
 
 IV.
 
 24
 At trial, Hawthorne denied all involvement with any drugs and testified that he had no knowledge of any drug dealing having occurred either at the townhouse or at the previous address where he and Smith had lived. On cross-examination, he stated that, except on television, he had never before in his life seen crack cocaine. While under oath during the sentencing proceedings, Hawthorne responded to a direct question from the court by reiterating that, except on television and again during his trial, he had never seen cocaine in any form. The court found that Hawthorne had committed perjury and enhanced his offense level by two points for obstruction of justice. See U.S.S.G. Sec. 3C1.1.
 
 
 25
 On appeal, Hawthorne does not debate the veracity of his testimony below, but instead contends that the testimony was not material and thus did not rise to the level of perjury. See United States v. Dunnigan, 113 S.Ct. 1111, 1116 (1993). We could not disagree more. Had the jury credited Hawthorne's trial testimony, it would certainly have acquitted him. As Hawthorne was instead convicted on all counts, no testimony introduced during the trial could have been more material to the ultimate issue.
 
 
 26
 The judgments of the district court are affirmed in their entirety.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 In violation of, respectively, 21 U.S.C. Sec. 846, 21 U.S.C. Sec. 841(a)(1), and 18 U.S.C. Sec. 924(c)
 
 
 [2]
 Miranda v. Arizona, 384 U.S. 436 (1966)
 
 
 [3]
 The ministerial duty of taking basic personal information incident to arrest and custody, because it is not likely to elicit an incriminating response, is not interrogation. United States v. Morrow, 731 F.2d 233, 237 (4th Cir.), cert. denied, 467 U.S. 1230 (1984) (quoting Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980))
 
 
 [4]
 See 18 U.S.C. Sec. 924(c)(1) (mandating consecutive five-year sentence)
 
 
 [5]
 The "inconsistencies" are that while the first warrant application spelled Smith's name correctly, described the townhouse development (which was actually Wood Edge Apartments) as "Woodson Townhouses," and ascribed initial control of the Honda to Mr. Simmons ("he stated he gave the use of the vehicle to Mr. Hawthorne ..."), the second application referenced an Andre "Soith," described the development as Woodside Townhouses, and noted that Mrs. Simmons relinquished control of the Honda ("she stated that she gave the vehicle to Trent Hawthorne and Andre Smith.")
 
 
 [6]
 The district court specifically found that Buffington was "neither dishonest nor reckless in preparing the affidavit." We may reverse that finding only if it was clearly erroneous. United States v. Jones, 913 F.2d 174, 176 (4th Cir.1990), cert. denied, 498 U.S. 1052 (1991). We hold that it was not
 
 
 [7]
 Likewise, where an accused waives his right to remain silent and then, at trial, offers a theretofore unasserted explanation of his actions or a freshly minted alibi, his initial silence concerning those matters can properly be introduced as impeachment evidence that his testimony is a recent fabrication. United States v. Pitre, 960 F.2d 1112, 1124-25 (2d Cir.1992); Phelps v. Duckworth, 772 F.2d 1410, 1412-13 (7th Cir.) (en banc), cert. denied, 474 U.S. 1011 (1985); United States v. Mireles, 570 F.2d 1287, 1291-93 (5th Cir.1978); Simmons v. Zahradnick, 465 F.Supp. 115, 118 (E.D. Va.1979)
 
 
 [8]
 In addition to Holt's extensive testimony regarding the extent of Hawthorne and Smith's drug trafficking, he testified that the .380 found in the safe belonged to Hawthorne. The other gun, Holt said, belonged to Smith. Once the appellants' possession of the firearms had been established, their proximity to the crack permitted the jury to conclude that the guns had played a role in the trafficking operation, such as protecting the appellants from their suppliers or customers, or had facilitated the operation's likelihood of success by, for example, emboldening the appellants. Either finding is all that is needed to support a conviction under 18 U.S.C. Sec. 924(c)(1). See, e.g., United States v. Brockington, 849 F.2d 872, 876 (4th Cir.1988). Though Holt was testifying under immunity, the jury obviously credited his testimony. That testimony alone, when viewed in the light most favorable to the government, would have allowed any rational trier of fact to find all the essential elements of each offense with which Hawthorne and Smith were convicted. Jackson v. Virginia, 443 U.S. 307, 319 (1979). We therefore reject both appellants' challenge to the sufficiency of the evidence